UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>LAMIEK WHITE,<br><br>Defendant. | Criminal No. 23-30022-MGM |

MEMORANDUM AND ORDER REGARDING
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE
(Dkt. No. 57)

May 16, 2025

MASTROIANNI, U.S.D.J.

## I. INTRODUCTION

On June 22, 2023, members of the Western Massachusetts Gang Task Force searched the third-floor apartment at 356/358 Page Boulevard, Springfield, Massachusetts, pursuant to a search warrant issued by Magistrate Judge Katherine Robertson on June 21, 2023. Defendant Lamiek White, who resided in the searched apartment, has filed a Motion to Suppress, asking the court to suppress all evidence seized during the search, including 274 grams of fentanyl and a firearm. Defendant argues the affidavit supporting the search warrant failed to establish probable cause to believe contraband would be found at his residence at the time the warrant was executed. He claims the affidavit did not support a finding of probable cause because it relied on information that was unreliable and stale and, therefore, failed to establish a sufficient nexus between the items sought in connection with the alleged criminal activity and 356/358 Page Boulevard. For the following reasons, the court denies Defendant's motion.

II. Background

On June 21, 2023, Officer Linus Nkansah, a member of the Western Massachusetts Gang Task Force ("WMGTF"), applied for a warrant to search two locations for evidence related to the distribution of narcotics. One of the locations, the third-floor apartment at 356/358 Page Boulevard, Springfield, Massachusetts, was Defendant's residence. An affidavit signed by Officer Nkansah was attached to the warrant application and set forth the basis for probable cause. (Dkt. No. 63-1 ("Aff.").)

The affidavit described an investigation into the distribution of narcotics containing heroin and/or fentanyl that involved Defendant and had been ongoing since approximately July 2022. Between October 2022 and April 2023, a cooperating witness, CW-1, made ten controlled purchases of drugs from Defendant, seven of which are detailed in the affidavit. (Aff. at ¶ 17.) CW-1 is described as a person without any pending criminal cases, willing to testify publicly, who had "been providing reliable information to the FBI since the fall of 2019" in exchange for payments, which thus far totaled $26,135. (*Id.* at ¶ 18.) Officer Nkansah wrote that "[a]lthough this affidavit does not include a summary of each controlled purchase, the beliefs I express in this affidavit are informed by all of them." (Aff. at ¶ 17, n. 5.) He went on to explain that "[t]he WMGTF followed FBI procedure for each of these controlled purchases." (*Id.*) The last controlled purchase made by CW-1 occurred in April 2023. Around that same time, the FBI installed a pole camera on Page Boulevard and this court issued a warrant authorizing the interception of wire communications over a cellular telephone used by Defendant and referred to in the affidavit as the TARGET TELEPHONE. (Aff. at ¶¶ 8, 12, 16, 19.) The following month, this court authorized the interception of wire communications over additional cellular telephones and Magistrate Judge Robertson authorized the installation of a GPS tracking device on a vehicle driven by one of Defendant's associates. (*Id.* at ¶¶ 13-14.)

Investigators were closely involved in coordinating the controlled purchases summarized in the affidavit. The first of these transactions occurred on November 21, 2022. Defendant initiated the controlled purchase by sending a text message to CW-1. (*Id.* at ¶ 19.) CW-1 did not reply until he met with investigators, who directed him to respond and try to set up a controlled purchase of "five packs of heroin/fentanyl."[1] (*Id.*) Investigators closely monitored the communications and transcripts of the exchanges between Defendant and CW-1 are included in the affidavit. Once Defendant provided CW-1 with a meeting location, Raylo Street in Chicopee, investigators "initiated surveillance at that location and monitored CW-1 as CW-1 drove to it." (*Id.* at ¶ 22.) An officer observed Defendant arrive at the location, exit his vehicle, and enter CW-1's vehicle. (*Id.* at ¶ 23.) After Defendant entered CW-1's vehicle, "[i]nvestigators maintained constant surveillance of CW-1 and [Defendant] as they drove from Raylo Street to the area of 350 Page Boulevard in Springfield." (*Id.*) They then "observed [Defendant] exit CW-1's vehicle and enter the driveway of 356/358 Page Boulevard." (*Id.*) Investigators lost sight of Defendant for a short time, before he reappeared in the driveway and then reentered CW-1's vehicle. (*Id.*)

A short time later, Defendant again exited CW-1's vehicle and returned up the driveway of 356/358 Page Boulevard. (*Id.*) CW-1 then "drove to a pre-determined meeting location while under the surveillance of investigators." (*Id.*) The affidavit describes the information provided by CW-1, which matched the investigators' observations and added two additional details. CW-1 told investigators that Defendant had removed five bundles of waxed baggies from his pocket when he returned to CW-1's vehicle, handed the packets to CW-1, and then received "$580 in official agency funds" from CW-1. (*Id.* at ¶ 24.) A special agent with the FBI received the packets from CW-1 and

---

[1] Throughout the affidavit, Officer Nkansah referred to the distributed narcotics as "heroin/fentanyl" and the court adopts the same practice. A pack of heroin/fentanyl typically contains 100 individual wax baggies, each of which contains single "dose" of approximately .02 grams. (Aff. at ¶ 19, n.7.)

observed they were "consistent with the manner in which heroin/fentanyl is packaged for wholesale and retail distribution in Western Massachusetts." (*Id.* at ¶ 25.)

The second controlled purchase occurred on December 13, 2022. Investigators met with CW-1 that day and directed CW-1 to send a text message to Defendant to arrange a controlled purchase of $2,000 worth of heroin/fentanyl. (*Id.* at ¶ 26.) The affidavit again includes transcripts of the communications between CW-1 and Defendant. Investigators conducted surveillance of 356/358 Page Boulevard during the time when CW-1 was arranging the controlled purchase. They observed a Mercedes arrive at the address shortly after CW-1 received a call from Defendant regarding where and when they would meet. (*Id.* at ¶ 29.) Investigators then observed Defendant exit the driveway on foot, retrieve a bag from the trunk of the Mercedes, and enter the passenger seat of the vehicle. (*Id.*) The Mercedes then drove away and, a few minutes later, Defendant again called CW-1 to discuss the timing for their meeting. Investigators followed CW-1 to the meeting location and also observed the Mercedes arrive. (*Id.* at ¶¶ 29-30.) "Using the transmitting device provided to CW-1, investigators overheard CW-1 having a conversation that was consistent with a drug transaction." (*Id.* at ¶ 31.) When CW-1 left the location, CW-1 was "under constant surveillance of investigators" until reaching a pre-determined meeting location. (*Id.*). At that location, CW-1 provided investigators with "a black plastic bag containing 36 half-packs of suspected heroin/fentanyl." (*Id.*) CW-1 then described the controlled purchase in a manner that was consistent with investigators' own observations, with the addition of the details that Defendant had handed the black plastic bag to CW-1 and "[i]n exchange, CW-1 provided [Defendant] with $2,000 in official agency funds." (*Id.*)

The next controlled purchase occurred on January 6, 2023. (*Id.* at ¶ 33.) Investigators directed CW-1 to send text messages to Defendant to set up a purchase of ten packs of heroin/fentanyl. (*Id.*) Defendant directed CW-1 to meet him at 320 Page Boulevard. (*Id.*) While

under surveillance, CW-1 drove to the location. (*Id.* at ¶ 34.) Around that same time, investigators observed the same Mercedes observed on previous occasions leave a location in Holyoke and drive to 356/358 Page Boulevard. (*Id.*) Defendant was seen exiting the Mercedes and walking up the driveway at 356/358 Page Boulevard out of investigators' sight. (*Id.*) The Mercedes drove away and Defendant came back down the driveway. (*Id.*) Investigators saw Defendant continue down the street to CW-1's parked vehicle. (*Id.*) He entered CW-1's vehicle briefly and then returned to 356/358 Page Boulevard. (*Id.* at ¶¶ 34-35.) CW-1 drove away and was followed by investigators to a predetermined meeting point. (*Id.* at ¶ 35.) Upon arrival, CW-1 gave 10 packs of suspected heroin/fentanyl to investigators and described the controlled purchase. (*Id.*) The information provided by CW-1 was consistent with investigators' observations and provided the additional details that Defendant was seated in CW-1's vehicle when he gave the suspected heroin/fentanyl to CW-1 and received "$1,120 in official agency funds" from CW-1. (*Id.*)

On February 1, 2023, CW-1 again "met with investigators to prepare for the controlled purchase of 10 packs of heroin/fentanyl." (*Id.* at ¶ 37.) The investigators directed CW-1 to send a text message to Defendant and, once again, the affidavit contains transcripts of the communications between CW-1 and Defendant (*Id.*) Around the same time that CW-1 sent the first text message to Defendant, investigators began conducting physical surveillance of 356/358 Page Boulevard. (*Id.* at ¶ 39.) About twenty-five minutes later, investigators observed the same Mercedes arrive and park in the driveway. Defendant was observed exiting the driver's seat of the vehicle and walking up the driveway of 356/358 Page Boulevard. (*Id.* at ¶ 40.) About a minute later, CW-1, followed by investigators, arrived at 320 Page Boulevard. (*Id.* at ¶ 41.) Investigators then observed Defendant come back down the driveway and enter the passenger seat of CW-1's vehicle. (*Id.*) The vehicle was seen making a U-turn and then proceeding to the driveway of 356/358 Page Boulevard. (*Id.*) Defendant exited the vehicle and walked back up the driveway. (*Id.*) CW-1 then drove away and

investigator's continued surveillance of CW-1's vehicle until CW-1 arrived at the agreed meeting place. (*Id.*) Upon arrival, CW-1 gave 20 half-packs of suspected heroin/fentanyl to investigators and described the controlled purchase. (*Id.*) The information provided by CW-1 was consistent with investigators' observations and provided the additional details that Defendant gave the suspected heroin/fentanyl to CW-1 and received "$1,200 in official agency funds" from CW-1 while CW-1's vehicle was in the driveway at 356/358 Page Boulevard. (*Id.*)

The next controlled purchase was initiated when Defendant sent CW-1 a text message on February 16, 2023. Investigators directed CW-1 to respond and set up a controlled purchase of 12 packs of heroin/fentanyl for later that afternoon. (*Id.* at ¶ 43.) A transcript of the text exchange is included in the affidavit. Shortly before the agreed time, investigators began physical surveillance of 356/358 Page Boulevard. (*Id.* at ¶ 45.) They observed Defendant exit the front seat of a Honda Accord sedan and walk out of sight. (*Id.*) After Defendant exited the vehicle, the sedan left the area. (*Id.*) Investigators also followed CW-1 to the area. (*Id.*) A few minutes after CW-1 arrived, Defendant was seen walking from 356/358 Page Boulevard to CW-1's vehicle. (*Id.* at 46.) Defendant briefly sat in the passenger seat and then returned up the driveway of 356/358 Page Boulevard. (*Id.*) Investigators followed CW-1 to a meeting location, where CW-1 provided them with 24 half-packs of suspected heroin/fentanyl. CW-1 also told investigators that while Defendant was in CW-1's car, he handed CW-1 24 half-packs of heroin/fentanyl. (*Id.* at ¶ 47.) One of the packs was torn open and, after CW-1 gave Defendant "$1,360 in official agency funds," Defendant put the money in his packet and retrieved two additional bundles that he gave to CW-1. (*Id.*)

On March 1, 2023, investigators again met with CW-1 "to prepare for a controlled purchase" and directed CW-1 to send a text message to Defendant. (*Id.* at ¶ 49.) The affidavit contains a transcript of the texts they exchanged. Investigators followed CW-1 to Page Boulevard. (*Id.* at 50.) They also commenced surveillance at 356/358 Page Boulevard several minutes before

CW-1 parked on Page Boulevard. (*Id.* at ¶ 51.) Investigators observed a Toyota RAV 4 arrive at 356/358 Page Boulevard and saw Defendant exit the driveway area, briefly enter the passenger seat, and then return up the driveway towards the rear door of the house. (*Id.*) A few minutes later, Defendant called CW-1. (*Id.* at ¶ 52.) Defendant again exited the driveway area. (*Id.*) He entered and exited the passenger seat of a Jeep SUV parked near CW-1's vehicle and then briefly entered and exited the passenger seat of CW-1's vehicle. (*Id.*) Defendant reentered the Jeep SUV and the vehicle drove away. (*Id.*) Investigators then followed CW-1 to their predetermined meeting spot. (*Id.*) Once again, CW-1 gave the alleged narcotics to investigators. (*Id.* at ¶ 53.) A field test was conducted and was positive for the presence of fentanyl. (*Id.*) CW-1 also described the controlled buy in terms that matched the investigators' observations and added that while Defendant was in CW-1's vehicle he had given CW-1 ten packs of heroin/fentanyl and CW-1 had given him $1,150. (*Id.*)

The last of the controlled purchases took place on or about April 18, 2023. Once again, the transaction was initiated by a text message CW-1 sent to Defendant at the direction of investigators and the affidavit contains a transcript of the text message exchange. (*Id.* at ¶ 55.) After they agreed to meet at an address in Chicopee, investigators initiated physical surveillance at 356/358 Page Boulevard. (*Id.* at ¶ 57.) Approximately twenty-five minutes later, investigators observed Defendant exit the driveway and enter a vehicle registered to him. (*Id.*) Investigators also followed CW-1 to the address in Chicopee. (*Id.* at ¶ 58.) CW-1 sent Defendant a text message to inform him that CW-1 had arrived at the agreed location. (*Id.*) Defendant arrived approximately ten minutes later. (*Id.*) On this occasion investigators used an audio recording device to monitor the transaction between Defendant and CW-1. (*Id.* at ¶ 59.) They heard CW-1 and Defendant "engage in a short conversation that was consistent with a retail drug transaction." (*Id.*) CW-1 drove away and was followed to a pre-determined location. Upon arrival, CW-1 gave the alleged narcotics to investigators. (*Id.* at ¶ 60.) A field test was conducted and was positive for the presence of fentanyl.

(*Id.* at ¶ 61.) CW-1 also described the controlled buy in terms that matched the investigators'

observations. Additionally, CW-1 told investigators that Defendant had dropped packs of

heroin/fentanyl on the front passenger seat of CW-1's vehicle and CW-1 had given him $1,730. (*Id.*

at ¶ 60.)

In addition to the controlled purchases made by CW-1, the affidavit describes two other

interactions investigators observed and believed to involve the sale of narcotics. On April 22, 2023,

investigators intercepted a phone call between Defendant and another individual. (*Id.* at ¶ 62.) Based

on that conversation, investigators understood Defendant was looking to purchase heroin/fentanyl

from the other individual. (*Id.*) The transcript and a summary are included in the affidavit. (*Id.*) Later

that same day, investigators observed an interaction with Defendant and a third individual outside

356/358 Page Boulevard, during which agents saw Defendant enter and exit multiple vehicles before

returning up the driveway to the house. (*Id.* ¶ 64.) Specifically, investigators observed Defendant exit

the third individual's vehicle with a box, enter a different vehicle, and exit that vehicle without the

box. (*Id.*.) At the end of the transaction, investigators saw Defendant return up the driveway to the

house. (*Id.*)

Towards the end of the portion of the affidavit focused on activities at 356/358 Page

Boulevard, there is a transcript of communications in which Defendant appeared to set up another

purchase of heroin/fentanyl, during a phone call intercepted on May 3, 2023, between Defendant

and Kevin Robles. (*Id.* at ¶ 66.) Defendant's language suggested he would obtain 30 packs of

heroin/fentanyl to sell the following morning. (*Id.* at ¶ 67.) The next morning, court-authorized pen

registers captured a flurry of communications between phone numbers used by Defendant, Jose

Heredia, Jr., and Abraham Heredia. (*Id.* at ¶ 68.) Based on the intercepted communications,

investigators initiated surveillance at 356/358 Page Boulevard. (*Id.* at ¶ 70.) They observed Robles

arrive and, a short time later, observed Defendant walk down the driveway of 356/358 Page

Boulevard and enter the passenger side of Robles's vehicle. (*Id.*) Several minutes later, Heredia, Jr. arrived and sent Defendant a text message. (*Id.*) Defendant then entered Heredia Jr.'s vehicle. (*Id.*) When he exited a couple minutes later, he had a white shopping bag. (*Id.*) He then reentered Robles's vehicle. (*Id.*) A few minutes later he exited the vehicle without the bag and walked back up the driveway towards the rear door of 356/358 Page Boulevard. (*Id.*) Finally, a separate section of the affidavit, related to a different location, contained transcripts of communications between Defendant and another individual consistent with Defendant seeking to purchase 50 packs of heroin/fentanyl on June 8, 2023. (*Id.* at ¶¶ 81-82.)

## II. ANALYSIS

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "Probable cause to search exists when police demonstrate 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Sylvestre*, 78 F.4th 28, 33 (1st Cir. 2023) (quoting *United States v. Khounsavanh*, 113 F.3d 279, 283 (1st Cir. 1997)). "In assessing whether a search warrant affidavit establishes probable cause, the court 'consider[s] . . . the "totality of the circumstances" stated in the affidavit.'" *Id.* (quoting *United States v. Tiem Trinh*, 665 F.3d 1, 10 (1st Cir. 2011)).

Defendant argues Officer Nkansah's affidavit was insufficient to establish probable cause to search his residence. Specifically, Defendant contends (1) Officer Nkansah relied too heavily on information obtained from CW-1 without adequately establishing CW-1's reliability; and (2) the

information in the affidavit was too stale to establish an adequate nexus between Defendant's residence and his activities related to the purchase and sale of heroin/fentanyl.

A.    <u>Information Provided by CW-1</u>

The court applies a "'nonexhaustive list of factors' to examine the affidavit's probable cause showing," when that showing is "based primarily on information provided by [cooperating informants] with some additional corroboration by police investigation." *United States v. Leonard*, 17 F.4th 218, 225 (1st Cir. 2021).

> These factors include, among others, (1) whether the affidavit establishes the probable veracity and basis of knowledge of persons supplying hearsay information; (2) whether an informant's statements reflect firsthand knowledge; (3) whether some or all of the informant's factual statements were corroborated wherever reasonable and practicable (e.g., through police surveillance); and (4) whether a law enforcement affiant assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's provided information.

*Tiem Trinh*, 665 F.3d at 10 (quotation marks and citations omitted). "'None of these factors is indispensable; thus, stronger evidence on one or more factors may compensate for a weaker or deficient showing on another.'" *Sylvestre*, 78 F.4th at 33 (quoting *United States v. Zayas-Diaz*, 95 F.3d 105, 111 (1st Cir. 1996)). Defendant asserts investigators did not take sufficient steps to establish that CW-1 is a reliable source of information, and the circumstances of the controlled buys were not sufficiently controlled to bolster CW-1's credibility. After careful review, the court concludes the totality of the circumstances supports the reliability of CW-1's information.

The only information in the affidavit supplied solely by CW-1 are the specific details relating to the exchanges of money for narcotics which occurred outside the view of investigators. The affidavit sufficiently established CW-1's basis of knowledge as to those details and also described other, independent sources of information about Defendant's activities. These included use of a pole cam outside his residence, interception of his telephone and text communications, and physical surveillance of 356/358 Page Boulevard.

Although the investigators did not observe every moment of the controlled buys, they closely supervised the transactions. CW-1 was a participant with firsthand knowledge of the transactions. Investigators were able to corroborate many of the observations made by CW-1 through their own direct surveillance of CW-1 and Defendant. Investigators also directed and corroborated the content of the text and telephone communications between CW-1 and Defendant before and during each controlled buy. They met with CW-1 before and after each controlled buy and followed CW-1 to and from each meeting with Defendant. They received the alleged narcotics from CW-1 and, in each case, the quantity was consistent with the amounts CW-1 sought in the communications directed by investigators.

Defendant faults the affidavit for not stating clearly whether investigators maintained constant surveillance of CW-1 and for not specifying that CW-1 was provided with prerecorded funds prior to each controlled buy, but these minor points do not undermine CW-1's credibility or the probable cause showing. Investigators engaged in their own surveillance that corroborated most of the details CW-1 shared regarding each controlled purchase. The critical moments during which the alleged narcotics were exchanged for money occurred outside the investigators' view, but investigators need not "observe a controlled buy in its entirety in order for the buy to support a probable cause determination." *Id.* at 34. The affidavit describes close coordination between investigators and CW-1 prior to each controlled purchase and identifies the money used by CW-1 during five of the transactions as "official agency funds." (Aff. at ¶¶ 24, 31, 35, 41, 47.) Additionally, before detailing any controlled purchases, Officer Nkansah stated that investigators had "followed FBI procedure for each of these controlled purchases." (Aff. at ¶ 10, n. 4.) "It is reasonable to infer, based on a common-sense reading" of the entire affidavit, that investigators took appropriate steps to ensure CW-1 possessed only the currency provided by investigators consistent with their directions for each transaction. *Sylvestre*, 78 F.4th at 35.

11

B.    Staleness

The probable cause analysis includes a "temporal component" that requires affidavits

supported by information that is not "stale." *Tiem Trinh*, 665 F.3d at 13. In other words, "an affidavit

supporting a search warrant must contain timely information or else it will fail." *United States v. Floyd*, 740

F.3d 22, 33 (1st Cir. 2014) (internal quotations omitted).   "'When evaluating a claim of staleness,

[courts] do not measure the timeliness of information simply by counting the number of days that

have elapsed.'" *Tiem Trinh*, 665 F.3d at 13 (quoting *United States v. Morales–Aldahondo,* 524 F.3d 115,

119 (1st Cir. 2008)). Instead, courts consider "various factors, including 'the nature of the information,

the nature and characteristics of the suspected criminal activity, and the likely endurance of the

information' in assessing the information's ripeness." *Id.* (quoting *Morales–Aldahondo,* 524 F.3d at 119).

"[A] 'primary consideration in evaluating the staleness issue is whether the affidavit describes a single

transaction or a continuing pattern of criminal conduct.'" *United States v. Nocella*, 849 F.2d 33, 40 (1st

Cir. 1988) (quoting *United States v. Tucker*, 638 F.2d 1292, 1299 (5th Cir., 1981)).

Defendant argued the affidavit could not support probable cause to search Defendant's

residence because the last controlled purchase by CW-1 occurred on or about April 18, 2023, and the

search warrant was not issued until June 21, 2023. A significant portion of the affidavit described

controlled buys involving CW-1 beginning in October 2022. Seven transactions which occurred over

approximately six months, from November 21, 2022 through April 18, 2023, were described in detail.

Each of those transactions was arranged through communications between CW-1 and a single cell

phone connected to Defendant. During six of those transactions, investigators observed Defendant

access the back entrance to 356/358 Page Boulevard shortly before meeting CW-1, immediately after

receiving payment from CW-1, or both. Investigators also observed Defendant around his residence

during apparent drug transactions on April 22, 2023 and May 3, 2023. This pattern is consistent with

Defendant storing heroin/fentanyl; cell phones, documents, and packaging materials related to illegal

drug sales; and money from such sales in his residence at 356/358 Page Boulevard. The affiant applied for the search warrant six weeks after the last of the transactions described in the affidavit. At that time, investigators had observed Defendant's apparent involvement in a scheme to distribute narcotics, often in close proximity to his residence, over a much longer period than the temporal gap between the last transaction observed by investigators and the search warrant application. *See United States v. Gonzalez Arias*, 946 F.3d 17, 25 (1st Cir. 2019) (observing that evidence connecting a location to a significant drug purchase was not stale when a search warrant was sought a month later because "[w]ell-networked, well-sourced, and well-settled drug peddlers . . . aren't likely to close up shop (and toss all the goods, papers, and tools in it) just a month" later).

Additionally, the affidavit described communications in May and June of 2023 which strongly suggested Defendant was purchasing significant quantities of heroin/fentanyl—3,000 "doses" on May 4, 2023 and 5,000 "doses" on June 8, 2023. The second of these transactions occurred just thirteen days before Officer Nkansah applied for the search warrant. The communications involved the same cell phone Defendant used to communicate with CW-1, which was also the subject of a Title III warrant to intercept previously obtained by investigators.

Surveillance during the sales to CW-1 established Defendant's likely use of his residence in connection with drug dealing activity. The months-long pattern of drug dealing, together with the large purchases in May and June documented in the affidavit, showed Defendant was likely continuing to use his residence as a base for his illegal drug trafficking. Those facts were sufficient to support a finding that at the time the affiant applied for the warrant, probable cause existed to believe that Defendant stored evidence related to his distribution of heroin/fentanyl— drugs, packaging materials, sales proceeds, and sales records contained on Defendant's cell phone—at his residence at 356/358 Page Boulevard.

C.    Good Faith Exception

Finally, even if the warrant did not support a finding of a probable cause, the good-faith exception to the exclusionary rule would apply in this case and evidence obtained through the search warrants would not be suppressed. "When a warrant issues without probable cause, the evidence obtained from the resultant search is ordinarily suppressed" pursuant to the exclusionary rule. *United States v. Sheehan*, 70 F.4th 36, 51 (1st Cir. 2023). "[T]he purpose of suppression is to deter police misconduct, and when law enforcement officers have obtained a search warrant in good faith and acted within its scope, there is nothing to deter." *Id.* (internal quotations omitted). Suppression can impose heavy costs, and courts have recognized a "good-faith exception" to the exclusionary rule for situations when the exclusionary rule "cannot pay its way" because the police have acted "with an objectively reasonable good-faith belief that their conduct is lawful" or "their conduct involved only simple, isolated negligence." *United States v. Gonzalez*, 113 F.4th 140, 148-49 (1st Cir. 2024) (internal quotations omitted); *see also Davis v. United States*, 564 U.S. 229, 237 (2011) ("For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.").

The good-faith exception applies "when officers 'objectively reasonabl[y] rel[y] on a subsequently invalidated search warrant,' [and] . . . 'the marginal or nonexistent benefits produced by suppressing evidence obtained in' these circumstances 'cannot justify the substantial costs of exclusion.'" *United States v. Jackson*, 118 F.4th 447, 454 (1st Cir. 2024) (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984) (last two alterations added)). "'This is particularly true . . . when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope.'" *Id.* (quoting *Leon*, 468 U.S. at 920). In this case, Defendant has not argued that the good-faith exception does not apply, and the court perceives no basis for finding either that the warrant was not obtained in good faith or that the search exceeded the scope of the warrant.

As detailed above, the affidavit contained detailed evidence that Defendant resided at 356/358 Page Boulevard, purchased and sold significant quantities of heroin/fentanyl over a period of more than seven months, and often accessed his residence directly before, during, and/or after engaging in drug trafficking transactions. Evidence included descriptions of observations made directly by investigators; reports from CW-1 that were consistent with investigators' own observations; and interceptions of wire and electronic communications. Any shortcomings were minor and did not render the warrant application facially deficient or cause "the affidavit supporting the warrant [to be] 'so lacking in inidicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Id.* (quoting *Brown v. Illinois*, 422 U.S. 590, 610-11 (1975)).

## IV. CONCLUSION

For the reasons set forth above, the court DENIES Defendant's Motion to Suppress (Dkt. No. 57).

It is So Ordered.

    /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge